IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMIR MUHAMMAD, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security, | : | No. 05-0238 |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

PETER B. SCUDERI
UNITED STATES MAGISTRATE JUDGE                                                                August     , 2005

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security ("Commissioner") denying the application of Samir Muhammad ("Plaintiff") for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383. The parties have filed cross motions for summary judgement. For the reasons set forth below, I recommend that Plaintiff's motion for summary judgment be granted; Defendant's motion for summary judgment be denied; the final decision of the Commissioner be vacated; and this matter be remanded for further proceedings consistent herewith.

**I.    PROCEDURAL HISTORY**

Plaintiff applied for benefits on October 15, 1999, alleging disability since August 15, 1998, because of headaches, runny eyes, vision problems, numbness in his legs and arm, and a swollen left knee. (Tr. 16, 84). His application was denied initially and upon

reconsideration. (Tr. 82-87, 90-94). Plaintiff requested a hearing before an administrative law judge ("A.L.J."), which was held on December 5, 2001. (Tr. 28-81). On January 22, 2002, the A.L.J. issued a decision denying Plaintiff's application. (Tr. 15-26). Plaintiff requested review by the Appeals Council, which was denied. (Tr. 5-8). Therefore, the A.L.J. decision dated January 22, 2002, is the final decision of the Commissioner. See 20 C.F.R. §§ 404.1584(d), 416.984(d). Plaintiff properly commenced this action seeking judicial review of the Commissioner's decision.

## II.   STANDARD OF REVIEW

Under the Social Security Act, a claimant is disabled if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve (12) months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under the medical-vocational regulations, as promulgated by the Commissioner, a five- (5-) step sequential evaluation is to be utilized to evaluate disability claims.[1]  In pressing his or her claim, the burden is solely upon the claimant to

---

[1] These steps are as follows:
> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . ., which result in a presumption of disability, or whether the claimant retains the capacity for work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the

prove the existence of a disability. 42 U.S.C. § 423(d)(5). A claimant satisfies this burden by showing an inability to return to former work. Once a showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given his or her age, education, and work experience, has the ability to perform specific jobs that exist in the economy. Rossi v. Califano, 602 F.2d 55, 57 (3d. Cir. 1979).

The Commissioner has supplemented this sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999); see also 20 C.F.R. §§ 404.1520a, 416.920a. These procedures require the A.L.J. to record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record, in order to determine if a mental impairment exists. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If an impairment is found, the A.L.J. must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The A.L.J. must then rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work. Id. If the mental impairment is considered "severe," the A.L.J. must

---

> fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

Sykes v. Apfel, 228 F.3d 259, 262-263 (3d Cir. 2000); see also 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f).

then determine if it meets a listed mental disorder. 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). If the impairment is severe, but does not reach the level of a listed disorder, then the A.L.J. must conduct a residual functional capacity assessment. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

Judicial review of a final decision of the Commissioner is limited. The District Court is bound by the findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. Allen v. Bowen, 881 F.2d 37, 39 (3d. Cir. 1989); Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984). Substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate." Burnett v. Apfel, 220 F.3d 112, 118 (3d Cir. 2000) (citing Plummer, 186 F.3d at 427). Even if the record could support a contrary conclusion, the decision of the A.L.J. will not be overruled as long as there is substantial evidence to support it. Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

### III.  FACTS

#### A.  Plaintiff's Background and Testimony

Plaintiff was forty-five (45) years of age at the time of the A.L.J.'s decision. (Tr. 16). He has a high school education and completed some college courses, but dropped out. (Tr. 34, 39). He has past relevant work as a juvenile counselor and art counselor. (Tr. 142). He also worked as a surveyor and a research surveyor, each for about one (1) month after the alleged onset of disability, but he was fired from those jobs due to

deteriorating performance and absences. (Tr. 45-46, 58, 142). He has one (1) daughter, age 24, but lives with his mother and a niece. (Tr. 44-45). He is not married. (Tr. 44).

Plaintiff testified that he could not work due to headaches, frustration, and not wanting to work around people, and that he experienced stress and sometimes heard voices. (Tr. 159, 55-56). He also testified that he could not work "because [of] the limitations that I have physically." (Tr. 50, 65, 159). He described sports-related knee problems, for which he was scheduled to have surgery. (Tr. 56-57). He testified that he uses a cane; that he can walk for half (½) a block before stopping; and that he could lift a maximum of ten (10) pounds. (Tr. 51-52). He also testified that he could take care of himself. (Tr. 49).

Plaintiff described a history of drug use, including cocaine and marijuana, but testified that he no longer abused drugs. (Tr. 40-42). He stated that he no longer takes medication for his mental problems, but that he takes Percocet, a narcotic painkiller. (Tr. 40, 53).

**B.     Medical Evidence**

Plaintiff's medical records for the relevant time period document both physical and mental problems. In January 2000, Plaintiff complained of "severe headaches" and dizziness, and Plaintiff was noted to have "psychosocial stressors" and "anxiety/depression." (Tr. 211, 215). Records from February 2000, indicate that Paxil[2]

---

[2]Paxil is indicated for the treatment of depression. Physicians' Desk Reference, 59th ed. (2005) ("PDR"), at 1586.

and Trazodone[3] proved ineffective for Plaintiff, who reported anxiety and difficulty sleeping. (Tr. 192).

An MRI performed on February 4, 2000, revealed an anterior osteophyte formation on Plaintiff's spine. (Tr. 213). An x-ray performed on June 12, 2000, showed degenerative changes present throughout the knees, including mild joint space narrowing, with no acute fractures. (Tr. 230).

On March 16, 2000, Kathryn Alban, M.A., conducted a psychological intake assessment of Plaintiff. (Tr. 233). Plaintiff reported sleep problems, feelings of worthlessness and hopelessness, prior suicidal ideation, agitation and anxiety. (Tr. 233). Ms. Alban diagnosed Plaintiff with depression disorder and rated him with a GAF score of 50.[4] (Tr. 233). Immediately thereafter, Plaintiff was psychiatrically hospitalized for ten (10) days due to "Depression and Psychotic Features." (Tr. 257). Upon discharge, he was again assessed with a GAF score of 50. (Tr. 257).

On March 28, 2000, David Lasky, M.D., a psychiatrist, completed a "Psychiatric Assessment." (Tr. 226, 232). Dr. Lasky diagnosed Plaintiff with bipolar disorder, with psychotic features. (Tr. 232). The doctor assessed Plaintiff with a GAF score of 45, and

---

[3]Trazodone is indicated for treatment of depression. See Physicians' Desk Reference, 57th ed. (1997) ("PDR 57"), at 596.

[4]A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000), ("DSM IV-TR"), at 34.

placed Plaintiff on Lithium[5] and Trazodone.  (Tr. 226).

On May 30, 2000, David E. Gross, M.D., a state agency psychiatrist, completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment for Plaintiff.  (Tr. 196-208).  Dr. Gross concluded that Plaintiff was "moderately limited" in thirteen (13) of twenty (20) mental domains, including the ability to perform activities within a schedule and maintain regular attendance; interact appropriately with the general public; respond appropriately to criticism from superiors; and maintain socially appropriate behavior.  (Tr. 205-206).

On July 21, 2000, Dr. Lasky noted that Plaintiff continued to take Lithium for mood swings and Trazodone for depression, and that he attended a behavioral modification program for his drug problems.  (Tr. 227).  On August 18, 2000, in response to Plaintiff's worsening anxiety and depression, Dr. Lasky increased Plaintiff's dose of Lithium.  (Tr. 224).  The doctor subsequently discontinued Trazodone, noting that Plaintiff's increased paranoia could be a side-effect, and instead prescribed Depakote.[6]  (Tr. 281-283).

On September 19, 2000, Plaintiff told Dr. Lasky that he felt "less stressed" while

---

[5]Lithium, or Lithium carbonate, is indicated for the treatment of manic episodes of bipolar disorder.  PDR at 1485.

[6]Depakote is indicated for the treatment of the manic episodes associated with bipolar disorder.  PDR at 437.  "A manic episode is a distinct period of abnormality and persistently elevated, expansive, or irritable mood."  Id.  "Typical symptoms of mania include pressure of speech, motor hyperactivity, reduced need for sleep, flight of ideas, grandiosity, poor judgment, aggressiveness, and possible hostility."  Id.

taking Depakote. (Tr. 281). The doctor informed the Department of Social Services in California (where Plaintiff then resided) that Plaintiff would be unable to work through March 2001, as a result of his bipolar disorder. (Tr. 223).

On October 2, 2000, Mounir Soliman, M.D., performed a consultative psychiatric evaluation of Plaintiff. (Tr. 236-239). Dr. Soliman noted that Plaintiff was being treated for bipolar disorder, and that he had a history of marijuana use. (Tr. 236-237). The doctor assessed Plaintiff with a GAF score of 65.[7] (Tr. 239).

On October 18, 2000, Joseph Hartman, M.D., a state agency medical expert, reviewed Plaintiff's medical records and completed a Residual Functional Capacity Assessment. (Tr. 245-252). Dr. Hartman opined that Plaintiff retained the functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 6 hours in an 8 hour day; and occasionally experienced postural limitations. (Tr. 246-247).

On December 8, 2000, Dr. Lasky noted that Plaintiff stopped taking Depakote due to nausea and nightmares. (Tr. 278). Plaintiff subsequently reported hearing voices and suicidal thoughts. (Tr. 261, 277).

On March 26, 2001, Plaintiff was discharged from a course of psychotherapy for

---

[7]A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM IV-TR at 34.

failing to appear for treatment or contact the facility for three (3) months.[8] (Tr. 257). His prognosis was noted as "poor" due to substance abuse and noncompliance with psychotherapy and medication. (Tr. 258, 262-263).

In April 2001, Plaintiff moved from California to Pennsylvania, and resumed treatment. Electromyography performed on Plaintiff on April 13, 2001, revealed mild chronic right lower cervical radiculopathy, mild lumbar steonisis, and a normal right leg. (Tr. 303). On April 30, 2001, the Consortium mental health center devised a psychiatric "Treatment Plan" for Plaintiff which contained a diagnosis of bipolar disorder, mixed, with psychotic features, and included a GAF assessment of 50. (Tr. 343).

On July 31, 2001, Plaintiff was examined by R. Bruce Heppenstall, M.D. (Tr. 348-349). Dr. Heppenstall indicated that Plaintiff had degenerative arthritis of his knees, more severe on the right., and continuous effusion of the right knee attributable to old sports injuries. (Tr. 348-349). Upon examination, Plaintiff exhibited grinding and continuing effusion in the right knee, with full range of motion of both knees. (Tr. 349). Dr. Heppenstall recommended a total right knee replacement.[9] (Tr. 348).

On July 25, 2001, Plaintiff reported that medication was helping with the "voices"

---

[8]Records indicate that Plaintiff failed to attend eight (8) sessions of the course of a one-(1-) year treatment. (Tr. 257-270, 179-291).

[9]Plaintiff avers that he lost his welfare health coverage shortly after the unfavorable A.L.J. opinion, and that he was therefore denied the knee replacement surgery. See Pl.'s Br. at 42. As a result, Plaintiff did not undergo knee replacement surgery until April 13, 2005, at which time both of his knees were replaced by Arnold T. Berman, M.D. See id.

9

he heard. (Tr. 324). Treatment records from the summer of 2001 indicate that Plaintiff's diagnosed dysphoric condition was controlled by medication, and that he did not appear at all of his appointments. (Tr. 324).

In December 2001, Charles Bridges, D.O., one of Plaintiff's treating physicians, opined that, from January 10, 1996, Plaintiff was limited to lifting no more than ten (10) pounds occasionally or five (5) pounds frequently; he could stand and/or walk no more than four (4) hours in an eight- (8-) hour workday; he could sit no more than seven (7) hours, and for no more than one (1) hour without interruption; he could never climb, stoop, balance or crawl; he could occasionally bend and crouch; and he was limited in his ability to reach, handle, push and pull. (Tr. 23, 298-302).

As of December 5, 2001, Plaintiffs medications included Neurontin for bipolar disorder and hallucinations, Trazodone for sleep problems, Seroquel for depression, Carbamazepine for depression, and Oxycodone for pain. (Tr. 298).

### C. Vocational Expert Testimony

A vocational expert ("V.E.") also provided testimony at Plaintiff's administrative hearing. (Tr. 70-72). The V.E. characterized Plaintiff's past relevant work as a juvenile counselor and art counselor are semi-skilled work that required interacting with co-workers and the public, and could be potentially stressful. (Tr. 71-72). The V.E. also stated that a person must be able to consistently complete tasks in a timely manner to be considered capable of performing substantial gainful activity. (Tr. 71).

## IV. DISCUSSION

By decision dated January 22, 2002, the A.L.J. found in relevant part:

> * * * *
>
> 3. [Plaintiff] has an impairments or a combination or impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(b) and 416.920(b).
>
> 4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5. The undersigned finds [Plaintiff's] allegations regarding his limitations are not totally credible for the reasons set forth in the body of this decision.
>
> 6. Excluding the effects of [Plaintiff's] knee impairment which will not meet the duration requirement, [Plaintiff's] impairments have left him with the following specific work-related limitations and capacities during the time period at issue – [Plaintiff] could lift and carry 20 pounds occasionally and 10 pounds frequently; he could stand and walk for 6 hours in an 8 hour day; he could occasionally stoop and/or crouch; he has had slight restriction of the activities of daily living; he has had moderate difficulties in maintaining social functioning; he has mild difficulties in maintaining concentration, persistence and pace (other than when he has been under the direct effects of marijuana abuse); and he has had a history of no more than 1 or 2 episodes of decompensation of extended duration.
>
> * * * *
>
> 8. [Plaintiff's] medically determinable impairments do not prevent [Plaintiff] from performing his past relevant work.
>
> * * * *

11

(Tr. 25). Thus, the A.L.J. reached step four (4) of the five- (5-) step sequential evaluation and found that Plaintiff was not disabled. (Tr. 26).

Plaintiff contends that the evidence of record demonstrates that he is disabled and that the A.L.J.'s decision at step four (4) is not supported by substantial evidence. Specifically, Plaintiff argues that the A.L.J.: (1) improperly based his decision on evidence excluded from the record; (2) erroneously evaluated the medical evidence; and (3) improperly failed to adequately evaluate Plaintiff's knee impairment.

**A.     Consideration of Evidence Excluded From the Record**

Plaintiff first argues that the A.L.J.'s decision is not supported by substantial evidence because the A.L.J. improperly relied upon evidence not properly in the record. Specifically, Plaintiff contends that the A.L.J. relied upon evidence and rationale from Plaintiff's previous, unsuccessful application for benefits,[10] even though the A.L.J. conceded that the only evidence relevant to his determination was evidence that post-dated the final decision in Plaintiff's prior application. (Tr. 16, 31).

In support of his position, Plaintiff relies on two (2) statements made by the A.L.J. in his decision dated January 22, 2002. In the first statement, the A.L.J. stated the following:

> In terms of the documentary evidence, the discussion of [Plaintiff's] medical history contained in the [A.L.J.] decision of March 12, 1997, and in

---

[10]Plaintiff's previous application for benefits was denied by A.L.J. decision dated August 21, 1992, which the United States District Court for the Eastern District of Pennsylvania found to be supported by substantial evidence on March 12, 1997. (Tr. 16).

> the Report and Recommendation of the Chief U.S. Magistrate Judge
> [approved and adopted on] March 11, 1999, are incorporated herein as
> though set forth at length.  That discussion of the past medical history is
> included insofar as it reflects on [Plaintiff's] medical impairments during
> the time period at issue herein,
> from March 12, 1997, through to the present.

(Tr. 22).  I find no problem with this statement.  When considering an applicant's medical history, it is entirely appropriate for the A.L.J. (and, indeed, the Court), to reference medical evidence that pre-dates the relevant alleged onset date in order to establish a framework, or context, for the subsequent medical evidence.

Plaintiff also takes issue with the following statement made by the A.L.J. in his January 22, 2002, decision:

> In light of the facts of [Plaintiff's] substance abuse history and his
> misrepresentations to the pertinent mental health professionals about the
> history as set forth in the Report and Recommendation of the U.S. District
> Court Chief Magistrate Judge dated February 22, 1999, the record cannot be
> seen to support a conclusion that [Plaintiff] has ever had a bipolar disorder
> with psychotic features.

(Tr. 18).  This statement is problematic.  When assessing credibility, it is appropriate for an A.L.J. to consider whether an applicant has misrepresented relevant information in the past, so long as past misrepresentations are not relied upon to the exclusion of other evidence that may be contrary and more recent.  Here, there is no question that Plaintiff misrepresented his substance abuse during the course of his *previou*s application for benefits, nor is there any question that the A.L.J. and the Court properly relied upon those misrepresentations in reaching their adverse decisions in 1997 and 1999, respectively.

However, there is also no question that Plaintiff *did not* misrepresent his substance abuse history during the course of his current application for benefits.  Moreover, contrary to the A.L.J.'s statement, Plaintiff continued to be diagnosed with a host of mental problems, including bipolar disorder, with psychosis, during the relevant time period.  (Tr. 223, 232, 343).

For all of the aforementioned reasons, I find that the A.L.J. improperly considered certain evidence in evaluating Plaintiff's mental problems.  Moreover, in stating that Plaintiff likely never had "a bipolar disorder with psychotic features," the A.L.J. improperly substituted his own medical opinion for that of a medical expert – a substitution that is particularly problematic insofar as that diagnosis appears in several places in the medical record during the relevant time period.  See Van Horn v. Schweiker, 717 F.2d 871, 874 (3d Cir. 1983) (stating A.L.J. cannot substitute his or her medical judgment for that of a competent treating medical source).  Therefore, I recommend remand of this matter for a proper and more thorough evaluation of Plaintiff's mental status, including a consultative psychiatric evaluation and/or medical expert testimony.

    **B.**    **Evaluation of the Medical Evidence**

Plaintiff also argues that the A.L.J.'s decision is not supported by substantial evidence because the A.L.J. erroneously evaluated the medical evidence of record. "[W]hen a conflict in the evidence exists, the A.L.J. may choose who to credit but 'cannot reject evidence for no reason or for the wrong reason.'"  Plummer, 186 F.3d at 429

(quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  It is axiomatic that the opinions of treating physicians have greater probative value than the opinions of an examining physician.  Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).  "A cardinal principle guiding disability eligibility determination is that the A.L.J. accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citing Plummer, 186 F.3d at 429); see also S.S.R. 96-2p, "Policy Interpretation Ruling: Giving Controlling Weight to Treating Source Medical Opinions" (providing for controlling weight where treating physician opinion is well-supported by medical evidence and not inconsistent with other substantial evidence in the record).  "An A.L.J. may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."  Id.

     Here, the A.L.J.'s consideration of Plaintiff's medical history contains several problems.  First, as previously noted, the A.L.J. improperly relied upon Plaintiff's *prior* misrepresentations about his marijuana use to discount medical evidence, including physicians' opinions, regarding Plaintiff's *current* mental status.  In speculating that Plaintiff's marijuana use may have caused his psychotic-like symptoms, the A.L.J. ignored Dr. Lasky's statement that he discontinued Plaintiff's Trazodone medication

because the Trazodone may have caused Plaintiff's increased paranoia.[11]  (Tr. 283).

Second, the A.L.J. ignored crucial psychiatric treatment records.  The A.L.J. ignored records from Dr. Lasky indicating that Plaintiff suffered from depression and bipolar disorder throughout 2000; that he was psychiatrically hospitalized for ten (10) days and was again diagnosed with bipolar disorder *at the time of discharge*; and that his GAF score was repeatedly assessed at between 45 and 50 by his treating psychiatrists. (226, 233, 257).  The A.L.J. also ignored treatment records from the Consortium mental health center, which repeated Plaintiff's earlier diagnosis of bipolar disorder, and which consistently assessed Plaintiff with a GAF score of 50.  (Tr. 335-343).  Instead, the A.L.J. credited the opinion of a one- (1-) time psychiatric consultative examiner, who assessed Plaintiff with a GAF score of 65.  (Tr. 24, 239).

Because I find that the A.L.J. ignored or mischaracterized important medical evidence of record, I conclude that this aspect of the A.L.J.'s opinion is not supported by substantial evidence.  These shortcomings are particularly problematic in this context because the A.L.J. declined to obtain an updated psychiatric evaluation of Plaintiff, as twice requested by counsel, and instead improperly substituted his medical judgment for that of competent treating medical sources as to whether Plaintiff suffers from bipolar disorder.  As a result, I conclude that an updated consultative psychiatric evaluation,

---

[11]Similarly, although the A.L.J. noted that Plaintiff stopped taking Lithium, the A.L.J. did not mention that Dr. Lasky discontinued Lithium because it was "ineffective," or that he substituted another anti-psychotic drug, Depakote, in its place.  (Tr. 282-283).

and/or medical expert testimony, is warranted upon remand.

### C. Plaintiff's Knee Impairment

Finally, Plaintiff argues that the A.L.J. improperly excluded Plaintiff's knee impairment from consideration of his R.F.C., on the grounds that the knee impairment did not meet the twelve (12) month jurisdictional requirement. As an initial matter, the Court notes that the A.L.J.'s opinion is confusing in this regard. In the body of his decision, the A.L.J. found that Plaintiff's knee impairments caused some limitations in Plaintiff's work-related capacities, and that the knee impairments were therefore "severe." (Tr. 18). However, the A.L.J. subsequently excluded the effects of Plaintiff's knee impairment from his R.F.C. determination because the knee impairment "will not meet the duration requirement." (Tr. 25). In any event, the record clearly indicates that the A.L.J.'s prediction regarding the short duration of Plaintiff's knee problem turned out to be false.[12] Therefore, in addition to further consideration of Plaintiff's mental status on remand, the A.L.J. is directed to properly consider the limitations, if any, imposed by Plaintiff's knee impairments during the relevant period.

---

[12] As previously explained, Plaintiff did not undergo knee surgery until 2005.

Therefore, I make the following:

## **R E C O M M E N D A T I O N**

AND NOW, this        Day of August 2005, it is RESPECTFULLY RECOMMENDED that Plaintiff's motion for summary judgment be GRANTED; Defendant's motion for summary judgment be DENIED; the final decision of the Commissioner be VACATED; and this matter be REMANDED for further proceedings consistent herewith.

BY THE COURT:


s\Peter B. Scuderi
PETER B. SCUDERI
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMIR MUHAMMAD, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security, | : | No. 05-0238 |
| Defendant | : | |

**ORDER**

AND NOW, this         Day of                    ,         , upon careful consideration of the Report and Recommendation filed by United States Magistrate Judge Peter B. Scuderi, and upon independent review of the Cross Motions for Summary Judgment filed by the parties, it is hereby ORDERED that:

1. The Report and Recommendation is APPROVED and ADOPTED.

2. Plaintiff's Motion for Summary Judgment is GRANTED.

3. Defendant's Motion for Summary Judgment is DENIED.

4. The decision of the Commissioner which denied disabled insurance benefits and supplemental security income is VACATED, and this matter is REMANDED for further proceedings consistent herewith.

BY THE COURT:

_____
THOMAS N. O'NEILL, J.